Daniel L. Germain (Cal. Bar No. 143334)
ROSMAN & GERMAIN LLP
16311 Ventura Blvd., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD A. KONG, ROBERT A. CRUZALEGUI, MATTHEW W. HEIDEN, and CASHAY L. CLAYBORN individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>        vs.<br><br>TRADER JOE'S COMPANY, THE BOARD OF DIRECTORS OF TRADER JOE'S COMPANY, THE INVESTMENT COMMITTEE, and JOHN DOES 1-30,<br><br>                Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Richard A. Kong, Robert A. Cruzalegui, Mathew W. Heiden, and Cashay L. Clayborn ("Plaintiffs"), by and through their attorneys, on behalf of Trader Joe's Company Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Trader Joe's Company ("Trader Joe's" or the "Company"), the Board of Directors of Trader Joe's Company ("Board") and its members during the Class Period, and the Investment Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.    Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.    In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015) (*Tibble I*).  Thus, the employer has no incentive to keep costs low or to

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.     The Plan has at all times during the Class Period maintained over 1.2 billion dollars in assets (including having over 1.7 billion dollars in assets in 2018), qualifying it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. These assets are entrusted to the care of the Plan's fiduciaries. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (June 29, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

13.     Plaintiff Richard A. Kong ("Kong") resides in Oak Park, California.  During his employment, Plaintiff Kong participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.  There was a final distribution of his Plan account in 2018.

14.     Plaintiff Robert A. Cruzalegui ("Cruzalegui") resides in Laguna Woods, California.  During his employment, Plaintiff Cruzalegui participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.  He continues to be a Plan participant.

15.     Plaintiff Mathew W. Heiden ("Heiden") resides in Portland, Oregon.  During his employment, Plaintiff Heiden participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.  He continues to be a Plan participant.

16.     Plaintiff Cashay L. Clayborn ("Clayborn") resides in Decatur, Georgia.  During her employment, Plaintiff Clayborn participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.  She continues to be a Plan participant.

17.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this

information is solely within the possession of Defendants prior to discovery.[2]  Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

19.     Trader Joe's is the Plan sponsor.  Trader Joe's 2018 5500 Filing with U.S. Dep't of Labor ("2018 Form 5500") at 1.  Its corporate headquarters is located at 800 South Shamrock Avenue, Monrovia, California.  *Id.*  Trader Joe's is a privately owned American chain of grocery stores established in 1967 by its founder Joe Coulombe.[3] By November of 2019, Trader Joe's was considered a competitor in "fresh format" grocery stores.  *Id.*  Trader Joe's had over 503 stores nationwide in 42 states and Washington, D.C. in 2019.  *Id.*

20.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.  First, the 2018 SPD identifies Trader Joe's as the "Plan Administrator."  *See* Trader Joe's Retirement Plan Summary Plan Description, January 1, 2018 ("2018 SPD") at 17.

21.     Second, as part of its fiduciary responsibilities, Trader Joe's designated Capital Research & Management Co. ("Capital Management"), as the Plan's recordkeeper. *Id* and *see also*, the 2018 Form 5500 at Schedule C, page 3.  Trader Joe's also appointed

---

[2]  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").  Indeed, several weeks prior to filing the instant lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  Their request for meeting minutes was denied.

[3] https://www.traderjoes.com/our-story/timeline

other Plan fiduciaries in its role as a Plan Administrator and through the Board (see below).   Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

22.    Third, Trader Joe's also made discretionary decisions to make matching and discretionary contributions (explained below) to Plan participants.  2018 SPD at 3.

23.    Lastly, at all times, Trader Joe's acted through its officers to perform Plan-related fiduciary functions.   These officers were acting in the course and scope of their employment.

### Board Defendants

24.    The Company acted through the Board to perform the Company's Plan-related fiduciary functions.  Upon information and belief, the Board appointed members of the Committee.   *See e.g.,* the Investment Policy Statement of Trader Joe's Company 401(k) Profit Sharing Plan ("IPS") at 1.  Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

25.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

26.    Members of the Board of Directors for Trader Joe's during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

27.    "The Investment Committee (the 'Named Fiduciary') is charged with responsibility for selecting an appropriate mix of investment options available to Plan participants." IPS at 1.  The Committee is tasked with monitoring the prudence of the Plan investments.  *Id.*   The IPS provides that the Committee shall "[p]eriodically review and

evaluate the selected investment options against established performance measurement criteria." *Id.*

28.     Additionally, the IPS "recapitulates the long-standing practices and approach of the Named Fiduciary and sets forth the manner in which Plan investment options are selected and monitored, consistent with the fiduciary standards of ERISA; including that (1) all transactions undertaken by the Name Fiduciary must be in the sole interest of Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in a prudent manner."  IPS at 1.

29.     Further, if periodic monitoring of Plan investments led to the identification of investment options that fell short of expectations, and were candidates for replacement, the Committee was obligated to "[r]eview the available 'universe' of possible investment options to identify possible alternatives that meet the criteria established under the investment option selection section." *Id.* at 4.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

31.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

32.     To the extent that there are additional officers and employees of Trader Joe's who are/were fiduciaries of the Plan during the Class Period, or other individuals were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Trader Joe's

officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.    THE PLAN

33.    The Plan was established on May 1, 1965 and restated effective January 1, 2018. SPD at 16.

34.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

35.    In general, the Plan covers "[e]mployees who have been employed for at least three months by Trader Joe's Company … or related employers and are at least 20 years of age." Report of Independent Certified Public Accountants for December 31, 2018 and 2017 ("2018 Auditor Report") at p. 5.

### *Contributions*

36.    There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution, catch up contributions for employees 50 year of age or older and an employer matching contribution.  2018 Auditor Report at p. 5. Participants can also roll over amounts from other qualified benefit or defined contribution plans.  SPD at 12.

37.    With regard to employee contributions, a participant may contribute "from one to 75 percent of pretax annual compensation … ." 2018 Auditor Report at p. 5.

38.    Trader Joe's made discretionary decisions regarding matching and other Company contributions to Plan participants.  2018 SPD at 3.

39.     "Each year, the Employer may make a discretionary nonelective contribution to the Plan." SPD at 3.  If Trader Joe's elects to make a contribution to the Plan, Trader Joe's will pay a single amount to "be 'allocated' or divided among participants eligible to share in the contribution for the Plan Year." *Id.*  Trader Joe's made a lump sum elective contribution to the Plan for each year of the Class Period.

40.     Like other companies that sponsor 401(k) plans for their employees, Trader Joe's enjoys both direct and indirect benefits by providing matching contributions, if any, to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

41.     Trader Joe's also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers."  *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

42.     Given the size of the Plan, Trader Joe's likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

43.     "Participants are immediately vested in their contributions plus actual earning thereon." 2018 Auditor Report at 5.  However, Employees must maintain continuous years of service to be eligible to vest in any monies contributed by the Company.  *Id.*  As detailed in the 2018 Auditor Report: "[p]articipants … are vested in Company contributions at 20 percent after two years of service and an additional 20 percent each year thereafter until 100 percent vested upon six years of service." *Id.*

***The Plan's Investments***

44.     Several funds were available to Plan participants for investment each year during the putative Class Period.  As noted above, the Committee determines the

appropriateness of the Plan's investment offerings and monitors investment performance. For 2018, the Plan offered 15 investment options, including 14 mutual funds and 1 collective trust in the form of a stable value fund.

45. The Plan's assets under management for all funds as of the end of 2018 was $1,747, 009,817. 2018 Auditor Report at 3. From 2014 to 2017 the Plan's assets under management ranged from more than $1.2 billion to $1.7 billion.

***Plan Expenses***

46. Generally, "[t]he expenses charged to the Plan may be charged pro rata to each Participant in relation to the size of each Participant's account balance or may be charged equally to each Participant." SPD at 5.

47. During the Class Period, the Plan entered into a recordkeeping and administrative services fee agreement with Capital Group that provided for the following fee schedule:

Standard Ongoing Fees

| Number of participants with account balances | Base Fee | | Per participant |
|---|---|---|---|
| 1-25 | $5,400 | + | $100 |
| 26-300 | $5,400 | + | $60 |
| 301-500 | $6,900 | + | $55 |
| 501-1,000 | $9,650 | + | $50 |
| Over 1,000 | $11,650 | + | $48 |

48.     Trader Joe's purports to have paid no more than $48 per-participant annual recordkeeping fees between 2014 and 2018.[4]

## V.     CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 29, 2014 through the date of judgment (the "Class Period").

50.     The members of the Class are so numerous that joinder of all members is impractical.   The 2018 Form 5500 filed with the Dept. of Labor lists 35,474 Plan "participants with account balances as of the end of the plan year."   2018 Form 5500 at 2.

51.     Plaintiffs' claims are typical of the claims of the members of the Class.   Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.   Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.   Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[4]   *See* Declaration of Catalina Vergara in support of Defendant Trader Joe's Company's Motion to Dismiss, *Marks et al. v. Trader Joe's Co*., No. 2:19-cv-10942-PA-JEM (C.D. Cal.), ECF 17-1, ¶ 10.   Plaintiffs do not concede this is the total amount Plan participants were charged for recordkeeping, but for purposes of this Complaint will assume this amount is accurate.

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

52.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

53.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

54.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

56.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

57.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

58.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

      (a)    they were so named; and/or

      (b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

      (c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      (d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

59.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law."  *Tibble*, 843 at 1197.

60.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id.,* at 224 (quotation marks and citations omitted).    Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

61.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

62.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

63.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary"), further provides that:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (A)
> if he participates knowingly in, or knowingly undertakes to

conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

64. During the Class Period, Defendants did not act in the best interests of the Plan participants. Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

65. Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

66. As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

## A.   Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

67. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial

consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), §7.

68.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trusts § 90, cmt. b) (*Tibble II*).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at p. 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

69.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

70.    In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and

service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*, at 2.

71.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at p. 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.*, at 5.

72.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

73.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

74.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble I*, 135 S. Ct. at 1823. In *Tibble I*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.*, at 1828. In so holding, the Supreme Court referenced with approval the UPIA, treatises, and seminal decisions confirming the duty.

75.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement

(Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

76.     When large plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

77.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

78.     During the Class Period, the Plan lost millions of dollars by offering investment options that had similar or identical characteristics to other lower-priced investment options.

79.     The majority of funds in the Plan stayed relatively unchanged during the Class Period. In 2018, a majority of the funds in the Plan, at least 11 out of the Plan's 14 mutual funds (78%) were much more expensive than comparable funds found in similarly-sized plans (plans having over a billion dollars in assets). The expense ratios for funds in the Plan in some cases were up to *825%* (in the case of Blackrock (Ishares) Russell 2000

Small Cap Index A) and ***294%*** (in the case of American Funds American Balanced Fund R4) above the median expense ratios in the same category:[6]

| Plan Fund | Expense Ratio[7] | ICI Category | ICI Median Fee |
|---|---|---|---|
| American Funds EuroPacific R4 | 0.84% | International Equity | 0.50% |
| American Funds Growth Fund of America R4 | 0.68% | Domestic Equity | 0.33% |
| American Funds American Balanced Fund R4 | 0.63% | Non-Target Date Balanced | 0.16% |
| American Funds Investment Company of America R4 | 0.64% | Domestic Equity | 0.33% |
| American Funds Washington Mutual Fund R4 | 0.62% | Domestic Equity | 0.33% |
| American Funds Income of America R4 | 0.61% | Non-Target Date Balanced | 0.16% |
| American Funds Bond Fund of America R4 | 0.61% | Domestic Bond | 0.36% |
| Blackrock (Ishares) S&P 500 Index A | 0.35% | Index | 0.04% |
| Blackrock (Ishares) Russell 2000 Small Cap Index A | 0.37% | Index | 0.04% |
| Blackrock (Ishares) MSCI EAFE | 0.36% | Index | 0.04% |

---

[6] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[7] All expense ratios are from 2019 except for the Index funds which are from 2020.

| Plan Fund | Expense Ratio[7] | ICI Category | ICI Median Fee |
|---|---|---|---|
| International Index A | | | |
| Blackrock (Ishares) US Aggregate Bond Index Fund A | 0.35% | Index | 0.04% |

80.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.   That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.   Indeed, the ICI median expense ratio for non-target date funds for plans with over 1 billion dollars in assets was 0.18% using 2015 data compared with 0.16% in 2016.   Accordingly, the median expense ratios in 2020 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019/2020 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

81.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

82.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.   Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.   There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

83.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

84.    Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017) (*Tibble III*).

85.    In several instances during the Class Period, including 2018 as demonstrated below, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2019 and 2020 expense ratios to demonstrate how much more expensive (difference between the lower expense ratio of the "I-Class" shares, and that of the share class of the fund in the Plan, as a percentage of the lower expense ratio) the funds were than their identical counterparts:

| Fund in Plan | Expense Ratio[8] | Lower Cost Share | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds EuroPacific R4 | 0.84% | American Funds EuroPacific R6 | 0.49% | 52.63% |
| American Funds Growth Fund of America R4 | 0.68% | American Funds Growth Fund of America R6 | 0.33% | 69.31% |
| American Funds American Balanced Fund R4 | 0.63% | American Funds American Balanced Fund R6 | 0.28% | 76.92% |
| Ameican Funds Small Cap World R4 | 1.05% | Ameican Funds Small Cap World R6 | 0.70% | 40.00% |
| American Funds Investment Company of America R4 | 0.64% | American Funds Investment Company of America R6 | 0.29% | 75.27% |
| American Funds Washington Mutual Fund R4 | 0.62% | American Funds Washington Mutual Fund R6 | 0.27% | 78.65% |
| Invesco Real Estate A | 1.27% | Invesco Real Estate R6 | 0.80% | 45.01% |
| American Funds Income of America R4 | 0.61% | American Funds Income of America R6 | 0.26% | 80.46% |
| American Funds Bond | 0.61% | American Funds | 0.25% | 83.72% |

---

[8] The listed expense ratios for both the funds in the Plan and the available lower cost share class are from 2019 except for the last four funds listed which are Index funds and are from 2020.

| Fund in Plan | Expense Ratio[8] | Lower Cost Share | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fund of America R4 | | Bond Fund of America R6 | | |
| American Funds US Govt Securities R4 | 0.63% | American Funds US Govt Securities R6 | 0.25% | 83.36% |
| Blackrock (Ishares) S&P 500 Index A | 0.35% | Blackrock (Ishares) S&P 500 Index K | 0.03% | 168.42% |
| Blackrock (Ishares) Russell 2000 Small Cap Index A | 0.37% | Blackrock (Ishares) Russell 2000 Small Cap Index K | 0.07% | 136.36% |
| Blackrock (Ishares) MSCI EAFE International Index A | 0.36% | Blackrock (Ishares) MSCI EAFE International Index K | 0.06% | 142.86% |
| Blackrock (Ishares) US Aggregate Bond Index Fund A | 0.35% | Blackrock (Ishares) US Aggregate Bond Index Fund K | 0.05% | 150.00% |

86.    The above is for illustrative purposes only.   During the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

87.    Utilizing A-shares for some of the Plan's investments was a particularly egregious failure of fiduciary duty.   "A-shares are one type of mutual fund share class. These shares target individual retail investors." [9] They are considerably more expensive

_____

[9] *See* https://www.investopedia.com/terms/a/ashare.asp

_____

than institutional share classes because, *inter alia*, they are "usually characterized by a front-end sales charge when traded through a full service intermediary." *Id.*   In other words, A-shares should have no place in a multi-million dollar plan, let alone a billion dollar plan like the Plan.

88.   As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds, although the initial investment minimum generally is waived for financial intermediaries and retirement plans. *See, e.g., Davis et al. v.* Washington *Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

89.   The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | Category | 2018 AUM |
|---|---|---|
| American Funds EuroPacific R4 | International Equity | $42,128,464 |
| American Funds Growth Fund of America R4 | Domestic Equity | $103,388,168 |
| American Funds American Balanced Fund R4 | Non-Target Date Balanced | $1,140,139,406 |
| American Funds Small Cap World R4 | World Fund | $25,506,088 |
| American Funds Investment Company of America R4 | Domestic Equity | $23,586,314 |
| American Funds Washington Mutual Fund R4 | Domestic Equity | $59,740,293 |
| Invesco Real Estate A | Real Estate Investment Fund | $17,049,261 |
| American Funds Income of America R4 | Non-Target Date | $16,321,670 |

| Fund in Plan | Category | 2018 AUM |
|---|---|---|
| | Balanced | |
| American Funds Bond Fund of America R4 | Domestic Bond | $40,329,800 |
| American Funds US Govt Securities R4 | US Gov't Bond Fund | $18,348,299 |
| Ishares S&P 500 Index A | Index | $40,176,107 |
| Ishares Russell 2000 Small Cap Index A | Index | $38,345,489 |

90. All of the lower share class alternatives were available during the Class Period. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments, including the above-referenced funds, into the lower share classes at the earliest opportunity.

91. Failure to do so was in violation of ERISA and the IPS which, as discussed above, required the Committee to review the entire universe of possible investment options to identify possible alternatives.

92. There is no good-faith explanation for utilizing higher cost share classes when identical lower cost share classes are available for the exact same investment. Indeed, given that the identical lower cost share classes were comprised of the same underlying investments as higher cost identical alternatives, and managed by the same investment manager, but had lower fees, they had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.

93. Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants. Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention. Either reason is inexcusable.

94.     Additionally, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing/revenue rebating (crediting) paid by the funds to defray the Plan's recordkeeping costs. *Tibble III*, 2017 WL 3523737, at * 8.  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing" *Id.*, at * 11, or revenue rebating (crediting).  Aside from it being completely unnecessary for a plan of this size, revenue sharing/rebating (crediting) immediately shifts all the fees to the Plan participants (to the detriment of participant returns).  The failure to adhere to this basic tenet of good fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative fee arrangements put in place by Defendants.

95.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

96.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

97.     It appears that during the Class Period, the Plan participated in American Funds' compensation recapture program through which recordkeeping fees and other Plan administrative costs were paid through the following structure.   The Plan's Trustee, Capital Bank and Trust Company ("Capital Trust" or "Trustee") made annual revenue credit payments, from the funds it received through revenue sharing, to a compensation recapture account.   The account was used to pay for recordkeeping expenses which according to Trader Joe's remained steady at $48 per participant during the Class Period with any excess amount purportedly paid back to the Plan.

98.     Over the years, this arrangement of placing revenue sharing funds into a compensation recapture account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs. This particular arrangement is not the cost-conscious management contemplated under the UPIA and it clearly was a waste of Plan participant money. *See* UPIA, § 7.  Moreover, this arrangement was in direct conflict with the IPS which required that "all transactions undertaken by the Name Fiduciary must be in the sole interest of Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in *a prudent manner*." IPS at 1.

99.     A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable per participant recordkeeping/administration fees.

100.     There is one glaring fact that demonstrates Defendants' failure to obtain reasonable recordkeeping fees for Plan participants.   Even though the number of Plan participants continued to grow from 33,537 to 46,602 between 2013 and 2018, the Plan always paid $48 per-participant recordkeeping fees.   And under the recordkeeping agreement, even if the Plan doubled in size, it would continue to pay the same per participant recordkeeping fee.   Such an arrangement is counter to prevailing fiduciary conduct.

101.   A 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grows, a plan can negotiate lower recordkeeping fees:[10]

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

102.   The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same amount in recordkeeping fees, there is little to suggest that Defendants conducted a Request for Proposal ("RFP") process at reasonable intervals – or certainly at any time between 2013 and the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.[11] This is especially troubling in this case given that it has been well-documented that large plans with tens of thousands of

---

[10] See https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/ retirement/study-of-401k-plan-fees-and-expenses.pdf.  Given the general trend of decreasing recordkeeping fees, the average cost per participant from **nearly 20 years ago** cited in the 1998 DOL Study would be much lower today.

[11] A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting an RFP at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.  *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

participants like the Plan can command recordkeeping fees as low as $18 to $27 per participant.[12] Given the number of Plan participants, even a $5 to $10 annual per participant reduction in recordkeeping costs would have saved the Plan and its participants millions over the course of the Class Period.

103. Accordingly, the Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciary's conduct. This confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs.

104. By failing to investigate the availability of certain identical lower share classes of the same funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. Further, to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants in a timely manner *or at all*, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period.

## C. Defendants Breached Their Duty of Loyalty to the Plan and Its Participants

105. The structure of this Plan is rife with potential conflicts of interest because Capital and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants. Here, an affiliate of Capital Trust, Capital Management performs the recordkeeping services for the Plan.

106. This conflict of interest is laid bare in this case where lower-cost mutual and index funds offered by American Funds, which are owned by a subsidiary of Capital Trust,

---

[12] *See, e.g., Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

were available but not selected because the higher-cost funds returned more value to Capital Trust and Capital Management (referred to collectively as "Capital Group"). The available lower-cost mutual and index funds from American Funds were materially similar or identical to the Plan's other American Funds (other than in price).

107.   There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in the coffers of Capital Group.

108.   The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Capital Group and its affiliates and ensure that the fees charged by Capital Group and its affiliates were reasonable and in the best interests of the Plan and its participants. Clearly, Defendants failed this aspect of their fiduciary duties.

## FIRST CLAIM FOR RELIEF

### Breaches of Fiduciary Duties of Loyalty and Prudence

### (Asserted against the Committee Defendants)

109.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

110.   At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

111.   As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

112.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's

investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.   Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.   The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  Likewise, the Prudence Defendants failed to monitor the manner in which recordkeeping services was paid.

113.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.   Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

114.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

115.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.   Accordingly, each Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries

### (Asserted against Trader Joe's and the Board Defendants)

116.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

117.   Trader Joe's and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

118.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

119.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

120.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, and imprudent choices of funds' class of shares that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;
>
> (b)   Failing to monitor the processes by which Plan investments were evaluated, and the Committee Defendants' failure to investigate the availability of lower-cost share classes; and
>
> (c)   Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused

the Plan to pay unreasonable recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

121.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

122.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge

against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated: June 29, 2020          **ROSMAN & GERMAIN LLP**


By: *s/ Daniel L. Germain*
Daniel L. Germain (CA Bar No. 143334)
16311 Ventura Blv., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
Email: germain@lalawyer.com

Donald R. Reavey
(*Pro hac vice to be requested*)
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101

Facsimile: (717) 233-4103
Email: donr@capozziadler.com

Mark K. Gyandoh
(*pro hac vice to be requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Counsel for Plaintiffs and the Putative Class